### SMITH, Receiver, &c., *v.* LANSING.

The financial officer of a bank is not disqualified from purchasing for his own benefit property pledged to it for a debt. He discharges his duty when he sees to it that the sale is for a price sufficient to discharge the lien, and does not stand as a trustee for any profit he may obtain by buying at that price.

The general manager of a bank may make arrangements to secure himself and others who, at its request, have become its sureties for money deposited.

Such security not having been given when the liability was assumed, the general manager may use the funds and property of the bank to indemnify the sureties at any time when the bank is solvent, and not contemplating insolvency.

Accordingly, where such a manager purchased in his own name real estate mortgaged to the bank, using its funds to pay his bid, and intending to hold the property for the security of himself and his co-sureties, and the bank afterwards became insolvent, *held,* that the receiver could not compel a conveyance without indemnifying the sureties.

APPEAL from the Superior Court of the city of Buffalo. Action to compel the defendant to convey to the plaintiff, as receiver of Oliver Lee & Co's Bank, at Buffalo, three parcels of real estate, the title to which the defendant claimed to hold

Smith *v.* Lansing.

as security for certain moneys he and his co-sureties had paid, or become liable to pay, for the bank, prior to the plaintiff's appointment as receiver. The trial was before Mr. Justice VERPLANCK, without a jury, from whose finding these facts appeared: The defendant, down to the time of the plaintiff's appointment as the receiver, was the president, principal financial and managing officer and agent of Oliver Lee & Co's Bank, an association formed under the general law, which had no board of directors. While such managing officer, the bank, upon three several occasions, applied for and received deposits of canal moneys of this State, upon condition that it should give security for the return of such deposits; and the defendant thereupon entered into three several bonds for the repayment of the moneys so deposited to the people of this State, and procured other persons to unite with him as sureties in such bonds. The defendant gave a similar bond, and procured sureties to unite therein with him, which was required as the condition of a deposit made with the bank by a savings bank in Buffalo. On the 10th June, 1857, certain real estate in Buffalo, upon which the bank had a mortgage, was exposed for sale under a prior mortgage. The defendant purchased in his own name, paying the amount of the prior mortgage, $5,147.94, out of the funds of the bank, and crediting $2,552.06, the residue of the purchase price upon the mortgage held by the bank. The property was worth $10,000. He did the same thing, with circumstantial variations which are sufficiently stated in the following opinions, in respect to two other parcels brought to sale in the city of Buffalo. The bank had no other knowledge of these transactions than by reason of the defendant's knowing them; and in each case, the entire consideration paid or allowed was the money and property of the bank. The defendant took the several conveyances to himself, for the purpose of securing himself and his co-sureties for their liabilities aforesaid. There was no evidence that the bank was insolvent or contemplated insolvency, until, after these transactions, in September, 1857, the proceedings were instituted for the appointment of a receiver. The judge held that the defendant

could hold the lands to secure himself and his co-sureties for the sum of $48,501.78, which they had paid or remained liable to pay; and he ordered judgment for a conveyance to the receiver, upon his paying that sum, or that, at the election of the plaintiff, the lands should be sold and the first proceeds appropriated to indemnify the plaintiff and his co-sureties.

Upon appeal this judgment was modified at general term, so as to require the plaintiff to convey to the receiver unconditionally. The defendant appealed to this court.

*John Ganson*, for the appellant.

*Solomon G. Haven*, for the respondent.

WELLES, J. The Oliver Lee & Co's Bank, at the times the defendant acquired titles in his individual capacity to the several parcels of real estate in question, had no board of directors, and it does not appear that it had, at any time since its organization, any such directors. The defendant was one of its stockholders, its president, and general managing agent and financial officer, during the period covering and including all the transactions mentioned in the pleadings and evidence in this case. He occupied, therefore, the place and possessed all the powers of such directors, and could legally do and perform all acts which they, at a regular meeting, had power to transact. It is to be intended that he derived these powers from the shareholders. The general banking law confers upon associations formed under it the powers, among other things, to carry on the business of banking, &c., by discounting bills, notes, and evidences of debt; by receiving deposits; by loaning money on real and personal security; and by exercising such incidental powers as shall be necessary to carry on such business; to choose one of their number as president, and to appoint such other officers and agents as their business may require, &c. (Laws of 1838, ch. 260, § 18.) It is proper, therefore, to consider the questions presented in the same light as if there had been a regular board of directors, and the acts done by the

Smith *v.* Lansing.

defendant had been done in pursuance of resolutions of such directors, adopted at a regular meeting thereof.

Suppose, then, that this bank had been managed by a board of directors, and, at a regular meeting, such directors had adopted a resolution authorizing their president to apply for and receive on deposit any portion of the revenues of the State, and had authorized him to procure other persons to join with him in a bond to the State conditioned to account for and pay over the moneys so deposited; and, in pursuance of such resolution, the president had become personally liable, by a proper bond, to account and pay over, &c., and had procured others, not connected with the bank as officers or stockholders, to become jointly bound with him as obligors in such bond, and the bank had thereupon received and used the moneys of the State: can there be any doubt that the bank would have been legally bound to indemnify and save harmless the obligors in such bond from loss or damage in consequence of their becoming parties to it? It seems to me not. And it seems equally clear that it would have been competent in such case for the bank, at any time after such bond had been given, to assign or transfer to the president, or to him and the other obligors so procured by and bound with him, any property or means in their power, sufficient for that purpose, to indemnify him or them against such bond, provided such assignment or transfer was not made in contemplation of insolvency. The same would be true, as it seems to me, if, instead of the president, with others not connected with the bank, becoming personally obligated, the directors had all united in a like personal obligation to secure the State, and had, at the same time, or afterwards, and while the bank was solvent, by resolution duly made, set apart in due form any of the assets or securities belonging to the bank, to a reasonable amount or value, for their indemnity against such personal liability. If provision could thus be made, through the action of a board of directors, for the security of depositors in a bank, and for indemnifying the sureties to such depositors, it is difficult to perceive why the same things might not be done by and through the agency of a president, clothed

with powers equal to such as are possessed by a board of directors, especially in the case of a bank which has no board of directors.  If the defendant, in the case at bar, had been obliged, in order to protect the other obligors in the bonds, to pay any portion of the moneys deposited by the State with the bank, from his individual resources, there could be no question of his right to take and retain, upon the first opportunity, from the cash funds of the bank, sufficient to reimburse himself.  Such a case might well occur with a bank having large transactions with the public, discounting freely upon the basis of such deposits and the reasonable expectation of prompt payments by its debtors, should the deposits be afterwards suddenly demanded, and there be a general failure on the part of such debtors to meet their engagements.  It is not, perhaps, extravagant to suppose a banking institution, in a perfectly sound and solvent condition, finding itself unable to meet the demands made upon it at a time of a sudden commercial panic; but, as soon as public confidence, which is the soul of our banking system, should be restored, be able to resume its accustomed course of business and transactions.

It is insisted, however, on the part of the plaintiff, that the character and position of the defendant, as agent and financial officer of this bank, was incompatible with his right to purchase the property in question in his own name, with the purpose of holding the same for his individual security or benefit.  It is, undeniably, a well settled general rule that where one acts as agent, trustee, guardian, executor or administrator, in the purchase or sale of property, or in the transaction of other business, in a fiduciary relation, the law will not permit him, in such purchase, sale or transaction, to act in his own name and for his individual benefit.  This rule has been established in consequence of the liability of mankind to be influenced by the motive of selfishness, which would, in most cases, lead the agent, &c., to give an undue prominence to his own interest, to the injury of that of his principal, &c.  "This rule," says Judge STORY, "is founded on the plain and obvious consideration that the principal bargains, in the employment, for the exer-

cise of the disinterested skill, diligence and zeal of the agent, for his own exclusive benefit. It is a confidence necessarily reposed in the agent, that he will act with a sole regard to the interests of his principal, as far as he lawfully may; and, if impartiality could possibly be presumed on the part of the agent, where his own interests were concerned, that is not what the principal bargains for; and, in many cases, it is the very last thing which would advance his interests." (Story on Agency, §§ 210, 211, and authorities there cited.) In the case of *Moore* v. *Moore* (1 Seld., 256), Judge GARDINER uses the following language: "The law does not stop to speculate upon the probabilities that the agent has resisted temptation; it removes the temptation by proclaiming in advance that he shall not acquire the property." The rule is a most reasonable and wholesome one, and has been too long settled to require the approbation of this court to commend it to the judgment and conscience of every intelligent mind for its support." If, therefore, the present case falls within the influence of this principle, the judgment of the general term of the Superior Court should be affirmed.

In my opinion, however, the case can be extricated from the force and operation of the rule. The question is not embarrassed by any consideration of fraud or want of good faith on the part of the defendant, nor of the contemplation of insolvency on the part of the bank, in the acquisition by the defendant of the property in question. Neither of these is averred in the complaint, proved on the trial, or found by the justice before whom the cause was tried. I think it cannot be maintained that the plaintiff, under the facts found, is entitled to have the property in question conveyed to him, as receiver of the effects of the bank, without relieving the defendant from his liability on his bonds to the People and to the savings bank, if the bank itself would not be entitled to the same judgment, provided there had not been a receiver appointed, and on the supposition that it is now, and had always been, in successful operation as a banking association. All the transactions involved in the question under consideration took place before the failure of the bank, and at times when, for aught that

appears, it was solvent and prosperous; and the receiver could acquire no claim or right, by virtue of his appointment, as against the defendant, which the association could not, at those times, have enforced against him. The defendant and his co-sureties had paid and were liable to pay, at the time of the trial, upon the three bonds to the People of this State, and the bond to the Western Savings Bank, over and above what they had received in dividends or otherwise, by way of reimbursement, an amount in the aggregate exceeding $48,000. The three parcels of real estate mentioned in the first three counts of the complaint, and which is the property now in controversy, were worth, at the time of the trial, in the aggregate, the sum of $24,000. This property is all the defendant has to indemnify himself and his co-sureties for such payments and liabilities. The sureties in each of the bonds were procured by the defendant, as president and managing agent, for the benefit of the bank; and the deposits could not have been obtained without giving security, &c. The co-sureties with the defendant became obligated with him at his request; and he is, therefore, bound to protect them. The complaint alleges that the defendant was a stockholder in the association to a considerable amount, and he is liable, to the amount of his stock, for the payment of the debts due by the bank. It was lawful and proper that he and his co-sureties should have put into his or their hands, by the association, means for their protection and indemnity against the large liabilities which they incurred by the execution of the several bonds mentioned; and this could not be done except by the defendant's own action, as he was the only organ through and by which the association could transact that or any other business. The association have received the direct benefit of the several amounts of money to secure which the bonds were given, and the creditors have indirectly had the benefit of the same by the consequent increase of the assets of the association. The defendant acquired title in his own name to the several parcels of real estate, and continues to hold the same, for the purpose of securing himself and his co-sureties from and against their liability on the seve-

Smith v. Lansing.

ral bonds referred to. Upon these facts—all of which are either stated in the complaint or found by the judge before whom the cause was tried—a strong equity in favor of the defendant is presented. He has the legal estate in the lands in question, and the plaintiff comes with an appeal to the equitable powers of the court, and asks to have the defendant divested of such legal estate and have it vested in himself unconditionally for the benefit of the creditors of the association, which, with such creditors, have, directly and indirectly, enjoyed the fruits of the transactions out of which the claim of the plaintiff, their representative, arose.

If this is equity, it must be by reason of the stern, unbending character and extended application of the principle before referred to. That principle, in its proper, just and equitable application, I am ready to stand by and enforce. But I do not believe it requires the sacrifice of substance to form, nor the prostration of plain and manifest justice, under the guise of equity or public policy.

It should be remembered that, in the present case, it is no part of the object of the action to set aside and vacate the sales of the several parcels of real estate in question by which the defendant obtained title thereto: on the contrary, the action is brought in affirmance of such sales, and the plaintiff's claim is that, in equity and conscience, the defendant has no right to retain the title for any purpose. If there had been a board of directors, and the defendant, possessing no greater power than is ordinarily incident to the office of president, had purchased the property and taken the title in his own name, without authority from the board of directors, the association would have had its election, within a reasonable time, either to disaffirm the sale and have a resale, or to affirm it and call upon the defendant to account for the moneys of the bank appropriated by him in making the purchase, together with the profits, if any, which he had made in the purchase; or the defendant might be required to convey the property purchased. The illegal act, in such case, would have been done and completed, and in calling upon the defendant to account or convey, the

title of the defendant would be necessarily assumed. In the latter case, the defendant would, of course, be entitled to the benefit of any equities in his favor connected with or growing out of the transaction. Upon the same principle, the defendant in the present case, under the facts as disclosed, should be permitted to set up any equities which exist, entitling him to retain the property, either absolutely or as security for the moneys advanced and the liabilities incurred for the association. The acts of infidelity to his principal, if any has been committed by him, are done and past, and the plaintiff does not seek to invalidate them. The defendant is liable to account or convey, and the only question is, upon what terms. Those terms should be, simply and only, those of equity and justice, which can only be by refunding to him the moneys paid for the association, and protecting him against the liabilities he has incurred for it.

But I am not willing to rest my conclusion on the grounds just stated. No wrong has been done by the defendant. Neither the association nor its creditors have been injured by him. As heretofore remarked, he stood in the place of a board of directors, with all the powers which the shareholders were able to delegate to him, which were no less than all they themselves possessed, so far as respected the corporate transactions of the association. It was not only lawful for him to apply for and receive the moneys in question, but his duty to do so, if he supposed they could be used to advantage in the business of the association. These moneys could not be obtained without security beyond the corporate responsibility of the association. He was, then, bound to furnish such security, if in his power; and, in doing so, it was lawful for him to pledge the property of the association to indemnify the sureties. It would have been lawful, if the canal board and savings bank would have been satisfied with it, for him to have given his own individual bonds, without any other sureties, and to have taken a like pledge for his own individual indemnity. But he procured others to unite with him in the bonds. He had, therefore, a direct interest and a clear right to indemnify himself and his

co-sureties, through the property and means of the association, against his and their liabilities so incurred. That he did not take such indemnity at the times the liabilities were respectively incurred, is of no consequence to the question under consideration. He had the sole control and management of the institution, and could do it as well afterwards as at the time. When the bonds to the people were respectively executed, it was probably quite uncertain what the deposits would amount to. There was, therefore, a manifest propriety in delaying it for a time in order to be able to approximate to the amount for which a reasonable indemnity should be taken. Neither is the form and manner in which it was accomplished, of any importance. The object and purpose were the material things.

To secure indemnity against these liabilities was a duty the defendant owed, not only to himself, but preëminently to the sureties whom he had procured to be bound with him. It is perceived, therefore, that one prominent position which the defendant lawfully occupied in regard to these transactions was that of security for the association. As such, he had a right to purchase the property, and, as president of the association and its managing agent and financial officer, to take its funds to pay the purchase money; and it being necessary to act in both characters in order to effectuate a lawful and justifiable end, his different acts must be referred to his rights and duties in each capacity, in the same manner as if some other person had been present as the financial officer of the bank, assenting to what was done, while he was attending to his individual rights merely. (*Commercial Bank of Buffalo* v. *Kortright*, 22 Wend., 348–355.)

I am of the opinion, for the foregoing reasons, that the judgment of the general term of the Superior Court should be reversed, and that of the special term of the same court affirmed, with costs of the appeals to the general term and to this court, to be paid by the plaintiff out of the effects of the association in his hands, or to come into his hands, as receiver.

COMSTOCK, Ch. J.   The bank held a mortgage upon the parcel of real estate designated in the case as No. 1.   When that parcel was exposed for sale under a prior mortgage held by another person, it was the official duty of the defendant, as the financial agent and manager of the institution, to see, so far as he was able, that the land should sell for enough to satisfy both the liens.   Beyond this, the bank had no interest in the premises or in the sale.   The situation of the defendant, therefore, was not such as to disqualify him absolutely from purchasing at that sale for his own benefit.   His duty and his interest might be in conflict until a sum was bid large enough to cover the demand which he represented as trustee or agent; but he had the same right which any other person had to buy at that price or at any greater price.   It was his duty to collect the debt due to the bank; but when that object was attained, he was under no further duty to speculate in its behalf.   The same observation, in substance, may be made in reference to the parcels Nos. 2 and 3.   In respect to No. 2, the bank appears to have had a mortgage upon some equitable interest of its debtors, the legal title being in a third person.   The defendant, by arrangement with all the parties, acquired the title, in consideration of which he surrendered the whole claim of the bank. As to No. 3, the debt due to the bank existed in a decree of foreclosure and sale against its debtor.   At the sale under that decree the defendant bid the sum of $5,000; but whether this was less than the sum due on the decree is not stated in the case.   The relations of the defendant, and the duty flowing therefrom, were the same in respect to all the three parcels. Having a controlling management of the bank, he was bound to take care that its liens should be made available so as to protect it from loss; and until that duty was discharged, he had no right to consult his own interest as a purchaser on his own account.   But he could purchase at prices which would satisfy the liens, provided he paid to the bank the amount thereof, or he could purchase at any price, if, by paying the bank debts, he perfectly protected the interests entrusted to him in his representative character.   There is neither principle nor authority for

the doctrine that the financial officer of a moneyed corporation cannot, in any circumstances, acquire an estate on which it has a lien for the security of a debt.  He must take the most scrupulous and exact care that the lien is made productive to its utmost value, and, therefore, he cannot buy for himself while anything remains due to his principal.  But he can, like other men, act for his own interest, by avoiding all conflict with the duty which his situation imposes.

The plaintiff in this case, representing, as receiver, no greater rights than the bank would have if it were a party to this controversy, demands from the defendant a conveyance of the titles acquired in the manner stated, and, in support of that demand, he invokes the doctrine that an agent or trustee cannot purchase, for his own benefit, an estate to which the agency or trust relates.  The general doctrine is extremely familiar. A person, who is the trustee of property, or has an agency in respect to it, is not allowed to take a situation producing a conflict of interests.  It is not this precise principle, but an analogous one, which would apply to this case, if the defendant had purchased for his own benefit.  ·The principle would be analogous only, and not identical, because the defendant had no trust or agency in respect to the lands in question.  He was the trustee, or agent, of those who owned the capital of the bank, and his duty was to collect the debts which constituted a portion of that capital.  It is, therefore, only one of the analogies of the doctrine involved which would apply, if the defendant had bought the lands on his own account, and the application would be made with the qualification which I have mentioned, that he might thus buy under the condition of satisfying the debts which were a lien on those lands.

But when we come to take a more exact view of the actual circumstances of the case, I see no room for the application of the rule invoked, or any of its analogies.  The defendant did not purchase for his own benefit, within the sense of that rule. Nor did he pay the prices with his own funds.  He used the funds of the bank, consisting either of money or of the very debts which were secured upon the lands which he bought.

Applying those debts and appropriating other means which belonged to the bank, he acquired the titles, and he did not even profess to make himself a debtor to the institution for the amount of its funds which he thus used, although he took the titles in his own name and with no attending declaration of trust in favor of his principal with whose funds he was thus dealing. If it were assumed that he designed to hold the lands thus acquired for his own benefit, the rights of the plaintiff would depend, not on the principle referred to, but on another, having a more simple and direct application to the facts. On that assumption, the defendant would stand in the situation of using the corporate funds without even the formality of borrowing those funds, and, therefore, without any pretence of authority, and investing them in a private speculation in lands. Upon such facts, the conduct of the defendant would be grossly fraudulent. The bank, in its election, could charge him as a defaulter, in respect to the assets thus used, or it could follow them into the lands acquired, and claim unconditionally a conveyance. As the defendant was a trustee in respect to the funds appropriated without authority, equity, if the bank so insisted, would impress the same trust upon the land, and a conveyance of the legal title could be rightfully demanded.

But no such fraud is imputed to the defendant, and he claims nothing to justify such an interpretation. Having used the assets of the bank, he admits that his purchase was in trust for the bank. The trust is, therefore, to be enforced; and this he does not contest. But what is that trust? A more exact and punctilious mode of dealing would certainly have suggested a contemporaneous declaration in writing, stating the purposes for which he took those titles. But there is no written evidence of this trust, and the plaintiff's remedy is simply and purely to enforce the one which the law implies from the circumstances. But all the circumstances must be considered. It appears that the defendant purchased the lands, using the funds of the bank, and took the title to himself, with the intention of holding it for the indemnity of himself and others who had united with him in becoming security to the State, and to a

savings bank in Buffalo, for moneys deposited with the institution. The finding at the trial is, that the defendant took title to the several parcels of land, claiming to hold them for that purpose. The transactions, in their real character, amounted, therefore, to an appropriation by the financial head of the bank of a certain portion of its funds and assets to the purpose of securing himself and his associates for the liabilities they had assumed. If he had a right to take a pledge for that purpose, it can make no difference in what form he kept the value in pledge. He might keep the assets thus appropriated, or he might invest them in land. If the bank might complain of such investment as unauthorized or unwise, and might, on that ground, charge him with a loss, if one should occur, this would furnish no reason for taking the value thus appropriated out of his hands unconditionally, provided he had a right to secure himself and his associates by taking any pledge whatever.

I see no reason for disturbing the arrangements in question, in opposition to the intention by which they were characterized. The plaintiff's claim, when stated according to law and logic, is, that the defendant holds the title to certain lands which he acquired by using the funds of the bank. This being true, the law impresses a trust upon the lands, and requires the defendant to convey them accordingly. But one of the objects embraced in the trust was the security of the defendant and others for certain liabilities. This object cannot be disregarded. The legal title is in the defendant, and the trust is not brought to light at all except through parol facts which the plaintiff must make out by proof or admission. But all the facts must be attended to, because they all tend to qualify and define the trust. The bank had liens upon each of the parcels of land to secure debts due to it. Undoubtedly, it was beneficial and wise to purchase them in order to make the liens available. At all events, the plaintiff suggests nothing to the contrary of this. The complaint is, that he purchased them for himself, contrary to his duty, as the managing officer of the bank. But this is an illogical view of the facts. The defendant purchased for

the bank, taking the legal title to himself for a security only, and he paid with the funds of the bank. The only question, then, is, whether he and his associates, in the liability which they had assumed, had a right to be secured by his act in the premises. And I think they had this right. It is in the usual line of business for a bank to take deposits. The State, as we know, requires security to be given, and any other depositor may require it. And if the president or cashier, being the general agent or manager, enters into the required bonds and procures others to unite with him, I see no reason why he may not, in good faith, take a counter security from the institution. He may be the actor in his official capacity, and, with others united in interest, he may also be the recipient in the transaction. What is fairly done for such a purpose should be allowed to stand. The result in this case will violate no rule of law, while equity will be promoted. The plaintiff claims a conveyance of a legal estate to effectuate a trust; but the trust, in its true character, will not be effectuated in the way he proposes.

These views lead to a reversal of the judgment given at the general term, and an affirmance of that of the special term of the Supreme Court.

BACON, J., expressed no opinion; all the other judges concurred—DENIO and DAVIES, Js., protesting, however, against any implication that the financial officer of a moneyed corporation is at liberty to speculate upon real estate bought by him under execution or the foreclosure of a mortgage in its favor.

Judgment reversed, and judgment at special term affirmed.